UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 12 CR 10112 GAO |
| | ) | |
| ZSOLT LENDVAI | ) | |
| | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

On October 14, 2011, Zsolt Lendvai and Eniko Somodi arrived in the United States.  A man named Z.K. paid for them to come and promised them work; honest work.  This was a lie.  Instead, Z.K. gave them fake passports and instructions to set up bank accounts in the name of bogus companies.  When they balked at his request, he threatened their families and told them they would have to pay back the travel costs.  Confused, scared, and completely alone in a foreign country, they agreed to commit the crimes for which they have been charged.  Prior to his involvement in this case, Zsolt Lendvai was a young man who had worked very hard, supported his parents, and never ran afoul of the law.  He is eager to return to Hungary and reunite with his family.

For the reasons that follow, Mr. Lendvai submits that a sentence of 24 months is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  *United States v. Kimbrough*, 128 S.Ct. 558 (2007); *United States v. Booker*, 125 S.Ct. 738 (2005); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008); *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008).

**BACKGROUND**

1.      <u>Personal</u> <u>History</u>

Zsolt Lendvai is 26 years old.  He was born and raised in Varpalota, Hungary.  He comes from a working class family and he followed in those footsteps.  Immediately upon graduating from high school he went to work in a factory.  He worked there for approximately two years before the factory closed.  He earned only $400.00 a month.  He then got a job as a kitchen worker and delivery man at a local restaurant.  He held this job for four years until business suffered and he was let go.  Undeterred, he found a job as a construction laborer, which he held for two years.  Quite simply, it is this history of hard work that more accurately defines who Zsolt Lendvai is as opposed to the 5 weeks of criminal behavior that comprises this case.

Mr. Lendvai's childhood was punctuated by his father's attempts to kill himself. At the age of 14, Zsolt found his father bleeding profusely after his father had slit his wrists.  At the time, Zsolt's father had recently lost his job, was drinking heavily, and gambling.  Shortly after this first attempt, Zsolt discovered his father stumbling around the house in the middle of the night and speaking incoherently.  He had taken a large number of pills in an effort to end his life.  Zsolt believes that the combination of alcohol abuse and losing his job led to severe untreated mental health issues that ultimately caused his father to try to take his own life.  Fortunately, Zsolt's father received mental health treatment following his second suicide attempt, and since that time he has been in good health and he has stopped drinking and gambling.  Not surprisingly, these events greatly impacted Zsolt and his family and the memory of finding his father is one that he will never forget.

2.    Offense Conduct

Mr. Lendvai's criminal conduct in this case took place over the course of roughly five weeks, from mid-October, 2011 – November 29, 2011.  During this time, he and others, including Eniko Somodi and Tamas Ringhoffer, used fake identification documents to open bank accounts in the names of fictitious companies.[1]  After opening an account, they would relay the account information to Z.K.  who would use this information to help complete the fraudulent scheme.  Specifically, Z.K., and presumably others, advertised automobiles for sale on eBay and would negotiate a sales price with prospective buyers.  Z.K. would then instruct the buyer to wire money into one of the accounts opened by Somodi, Lendvai, or Ringhoffer.  Once the purchaser deposited the money into the account, Z.K. gave instructions to Somodi, Lendvai, or Ringhoffer as to what to do with the money.  Typically, the defendants wired the money to bank accounts in Hong Kong.

While Somodi, Lendvai, and Ringhoffer all acted knowingly and intentionally, it is also true that each of them was lured to the United States under the promise of honest work, and it was only once they arrived here that they were told what was expected of them.  Each of them balked, but ultimately relented when faced with the threat that their families would be harmed.  They were young and naïve and ultimately they are paying the price for their actions while those who conceived the scheme and executed it are enjoying its fruits.  While Lendvai's actions resulted in the laundering of roughly $1.1 million, he stood to gain only $5,000.

---

[1] The government indicted Ringhoffer and Somodi separately.  Ringhoffer was sentenced to time served, roughly 10 months by Judge Young.  *See United States v. Ringhoffer*, 12-10113-WGY. Somodi awaits sentencing.

## ARGUMENT

### 1.     Calculation of the Sentencing Guidelines Range

The parties entered into a plea agreement in which the government takes certain positions regarding the calculation of the sentencing guidelines in this case.  The defendant agrees with those calculations.[2]  In addition, defendant believes, and the government agrees, that Mr. Lendvai should receive a two-level reduction based on his minor role in the offense (U.S.S.G. §3B1.2(b) and a further reduction in his sentence because he committed the instant offense while under serious coercion (U.S.S.G. §5K2.12).

### A. Minor Role

Defendant submits, and the government agrees, that he is entitled to a two-level reduction for his mitigating role in the offense. U.S.S.G. §3B1.2 permits a two to four-level decrease in the offense level for a defendant who is a minimal or minor participant in any criminal activity. *United States v. Lopez-Gil*, 965 F.2d 1124, 1131 (1st Cir. 1992).  The application notes to this guideline make clear that in fraud cases a reduction is appropriate "for a loss amount under §2B1.1 that greatly exceeds the defendant's personal gain from a fraud offense and [for a defendant] who had limited knowledge of the scope of the scheme."  Application Note 3(A), U.S.S.G. §3B1.2.  The application notes to this guideline further define a minor participant

---

[2] The parties' view of the sentencing guidelines differs in two material ways from the calculation done by the Probation Department in the Presentence Report.  First, the parties agree that Mr. Lendvai should receive a two-level reduction under U.S.S.G. §3B1.2(b) for his minor role in the offense (the government did not agree to this in the plea agreement but undersigned counsel has been told by the Assistant United States Attorney that he will advocate for this reduction at the time of sentencing).  Probation does not believe that Mr. Lendvai should receive such a reduction. Second, the parties believe that Mr. Lendvai was coerced into committing this offense and that some reduction is warranted under U.S.S.G. §5K2.12.  Based on these differences, the Presentence Report calculates a sentencing guidelines range of 51-63 months.  *See* PSR ¶ 91. The parties, after a reduction for minor role, believe the sentencing guidelines range is 46-57 months; this calculation is prior to any further reduction under U.S.S.G. §5K2.12 or under U.S.S.G. §5K1.1.

as any participant "who is less culpable than most other participants, but whose role could not be described as minimal." Application Note 5, U.S.S.G. §3B1.2.

Here, the uncontroverted facts make clear that Mr. Lendvai played a limited role in the conspiracy. Specifically, Mr. Lendvai did not participate in listing cars on the internet or creating the names and business papers of the false companies used to launder money. Rather, Z.K. provided him with all the paperwork on the companies in question and the fake identification papers he would need to open up the various bank accounts. In fact, Mr. Lendvai could not even read the paperwork he received and when he went to the bank a translator was used to help assist in opening the accounts. Quite simply, he was provided absolutely no information about other aspects of the criminal offense and he met no one higher up other than Z.K. This was obviously intentional in order to protect the individuals who actually devised, executed, and profited from the scheme. In short, Mr. Lendvai exercised absolutely no independent judgment whatsoever as to any of the criminal activities he engaged in. Each and every one of his actions was at the very specific direction of Z.K. Finally, it is significant under application note 3(A) that Mr. Lendvai stood to gain only $5000 for his participation in the offense; yet, he is being held responsible for a loss amount of over $1 million.

Therefore, the available evidence establishes that Mr. Lendvai was substantially less culpable than other individuals involved in the criminal activity alleged in the instant information. As such, the defendant requests, and the government agrees, that the Court should reduce his offense level by two points to reflect his minor role in the offense.

**B.** __Coercion__

Section 5K2.12 of the United States Sentencing Guidelines recommends that the sentencing court consider whether a defendant committed the instant offense because of "serious coercion, blackmail or duress."  U.S.S.G. §5K2.12.  Should one of these factors be present the court may depart downward in sentencing the defendant. *Id.*  Here, the government agrees that Mr. Lendvai committed the instant offense because of threats made to him by Z.K. and that a downward departure is warranted.[3]  In *United States v. Sachdev, 279 F.3d 25(1st Cir.)*, the First Circuit stated that a departure under this section is "encouraged" when the defendant is threatened with physical injury and a reasonable person would perceive there to be a threat.  *Id.* at 28-29.

The chronology of events in this case support a finding that Mr. Lendvai acted under serious coercion.  First, he comes to this country because he and Ms. Somodi are promised work – honest work.  Yet, when they get here Z.K. tells them what is really expected of them and they refuse to do it.  Z.K. then threatens to harm their families.  He also tells them that the people he works for are "looking for the family" of someone who previously refused to participate in the crime.  Separated from their families, and alone in a foreign country they agreed to commit the instant offenses.  This decision was inextricably intertwined with the threats and justifies a departure from the otherwise applicable guidelines range.

---

[3] Counsel understands that the government believes a 20% reduction below the low-end of the guidelines range, after departing two-levels for minor role, is an appropriate reduction.  Counsel also understands that the government will be requesting a sentence of 31 months incarceration.

**2.      A Sentence of 24 Months Comports With the Sentencing Goals of 18 U.S.C.
        § 3553(a).**

As this Court knows, the Sentencing Guidelines no longer bind the Court.  United

States v. Booker, 125 S.Ct. 738 (2005).  Instead, under 18 U.S.C. § 3553(a), the Court

should impose a sentence that is "sufficient but not greater than necessary" to achieve the

four purposes of sentencing set forth in Section 3553(a)(2).  The First Circuit elaborated

on the meaning and breadth of the so-called parsimony principle in United States v.

Yonathan Rodriguez, 527 F.3d 221 (1st Cir. 2008).  In Rodriguez, the First Circuit

stressed that the Supreme Court ruling in Kimbrough requires a "more holistic inquiry"

and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is,

rather, a tapestry of factors, through which runs the thread of an overarching principle."

Id. at 228.  That overarching principle is to "impose a sentence sufficient but not greater

than necessary."  Id.  In reaching a decision on what constitutes an appropriate sentence,

the district court should "consider all the relevant factors" and "construct a sentence that

is minimally sufficient to achieve the broad goals of sentencing."  Id. (emphasis added).

**A.      Nature and Circumstances of the Offense and History and
        Characteristics of Mr. Lendvai**

There is no disputing that the conduct Mr. Lendvai engaged in was serious and he

has consistently and repeatedly recognized that his behavior in this case was wrong.  He

also realizes that his actions have hurt many people and resulted in the victims losing

their hard earned money.  However, balanced against this reality are the reasons Mr.

Lendvai became involved in the conspiracy.   Specifically, Mr. Lendvai's actions must be

considered in the context of the position in which he found himself: Z.K. threatened him

and his family; he was isolated from his family and friends - other than Somodi; he had

no resources with which to return to Hungary; and he did not speak English.  Regrettably, these circumstances led to Mr. Lendvai's participation in the instant offense.  Sadly, he did not mustard the strength to stand up to Z.K. and extricate himself from the situation.

Mr. Lendvai submits that the nature and circumstances of the offense, although serious, are ameliorated by his history and characteristics.  He is 26 years old, a native of Hungary, with absolutely no history of criminal behavior.  Mr. Lendvai comes from a close knit working class family.  His childhood was uneventful except for the horrific fact that twice he discovered his father immediately after he had attempted suicide. Obviously, those traumatic experiences have stayed with him, but thankfully his father is healthy and happy now and Mr. Lendvai  and his family remain extremely close.

At all times prior to this offense, Mr. Lendvai had been a hard-working and law-abiding person.  He graduated from high school in Hungary and the very next day he started working in a local factory.   He held that job for two years before the factory closed.  Almost immediately, he found another job as a kitchen worker and delivery man at a local restaurant.  He held that job for nearly four years until he was laid off because business was bad.  Quite simply, Mr. Lendvai's life history up until his commission of the instant offense demonstrates that he very likely never would have committed this crime had it not been for the position he found himself in and Z.K.'s threats.

**B.      Mr. Lendvai is not at Risk to Recidivate**

When Mr. Lendvai finishes whatever sentence the Court imposes, he will be deported to Hungary with no possibility, or desire, of returning to the United States.  He is at no danger to recidivate because of the unusual circumstances that led to his participation in the instant offense, and the devastating consequences this case has had on

him personally.  Specifically, as detailed above, Mr. Lendvai did not come here with the intent to commit this crime and his prolonged separation from his family has profoundly affected him.  His time in prison has been marked by his inability to communicate effectively with his fellow inmates and guards which serves to only increase his anxiety level.  In addition, he has only sporadic telephone contact with his family because of the prohibitive cost of calling Hungary.  These factors, coupled with the fact that Mr. Lendvai will never return to the United States, provide adequate assurance that he will not recidivate.

## CONCLUSION

For the reasons set forth above, Mr. Lendvai submits that a sentence of 24 months is "sufficient but not greater than necessary" to address his actions in this case.  18 U.S.C. § 3553(a).


ZSOLT LENDVAI,
By his attorney,

/s/ Stylianus Sinnis
Stylianus Sinnis
  B.B.O. #560148
Federal Defender Office
51 Sleeper Street, Fifth Floor
Boston, MA  02210
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I, Stylianus Sinnis, certify that a copy of Defendant's Sentencing Memorandum was served on all counsel of record via ECF filing on January 16, 2013.

/s/ Stylianus Sinnis
Stylianus Sinnis